IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JIMMIE LEWIS,                              )
a/k/a Emmanuel E. Elder,                   )
                                           )
            Plaintiff,                     )
                                           )
    v.                                     ) Civ. Action No. 05-013-GMS
                                           )
RAPHAEL WILLIAMS, et al.,                  )
                                           )
            Defendants.                    )

## MEMORANDUM

## I. INTRODUCTION

The plaintiff, Jimmie Lewis, a/k/a Emmanuel E. Elder ("Lewis"), who proceeds *pro se*,

filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. At

the time he filed the complaint, Lewis was an incarcerated individual within the Delaware

Department of Correction ("DOC"). Lewis is no longer incarcerated and no longer resides in the

State of Delaware. Before the court is the State defendants' motion for summary judgment and

Lewis' opposition thereto.[1] (D.I. 301.) For the reasons that follow, the court will grant the

motion for summary judgment.

## II. BACKGROUND

Lewis filed this action raising a number of claims, all of which he alleges violated his

constitutional rights. (D.I. 2, 8, 18.) During the relevant time period, from May 2003 to March

2005, with the exception of one month, Lewis was housed at the Howard R. Young Correctional

Institution ("HRYCI"), Wilmington, Delaware, as a pretrial detainee. He was convicted on

---

[1]The defendants amended their opening brief and, therefore, the court considers the
amended opening brief found at docket item 305. (*See* D.I. 302, 305.)

October 21, 2003, of carjacking in the second degree, felony theft, and resisting arrest, and sentenced on February 11, 2005, to eight years at Level V, suspended after six years for decreasing levels of supervision.[2] *In re Lewis*, 918 A.2d 1170 (Table), 2007 WL 328806 (Del. 2007); *State v. Lewis*, I.D. No. 0305016966, 2008 WL 3413332 (Del. Super. Aug. 11, 2008); (D.I. 275 at 896-901.).

The court dismissed several claims and defendants following screening of the complaint pursuant to 28 U.S.C. § 1915. (D.I. 25, 26.) Lewis was allowed to proceed with: (1) conditions of confinement claims against C/O Mark Blue ("Blue"), former James T. Vaughn Correctional Center ("VCC") Warden Raphael Williams ("R. Williams"), former DOC Commissioner Stanley Taylor ("Taylor"), Sgt. Fred Way ("Way"), C/O Richard Gassner ("Gassner"), Cpl. Arthur Davis ("Davis"), C/O Zachary Rodriguez ("Rodriguez"), and Capt. Mark Emig ("Emig"); (2) medical needs claims against Lt. Patrick Sheets ("Sheets"), Capt. Philip Parker ("Parker"), Sgt. Charles Richards ("Richards"), Way, Silvia Farmer ("Farmer"), Sgt. Howard Kennedy ("Kennedy"), Taylor, R. Williams, former DOC Security Superintendent Major Dave Williams[3] ("D. Williams"), Lt. Joseph Sabato ("Sabato"), Emig, Capt. Brian Berggrum ("Berggrum"), Capt D. Bamford ("Bamford")[4], C/O Glenn Wayman ("Wayman"), and former VCC Warden Thomas R. Carroll ("Carroll"); (3) access to the courts and taking of legal property claims against Taylor and R. Williams; (4) excessive force and failure to protect claims against Davis, C/O Corey Johnson

---

[2]The status under the Constitution of a convicted inmate awaiting sentencing is that of a pretrial detainee. *Fuentes v. Wagner*, 206 F.3d 335, 342 (3d Cir. 2000).

[3]D. Williams was responsible for the daily operations of security and sanitation at the HRYCI. (D.I. 302, A127.)

[4]Misspelled on the court docket as Barnford.

-2-

("Johnson"), C/O Bradford Apa ("Apa"), Cpl. Christopher Chappel ("Chappel")[5], Kennedy, Sgt. Michael Lewis ("M. Lewis"), and Lt. Donald Chudzik ("Chudzik"); and (5) due process claims against Taylor, R. Williams, Sheets, Sabato, Parker, Farmer, C/O Christopher Canon ("Canon"), C/O Vincent Williams ("V. Williams"), C/O Gary Ince ("Ince"), and Way.[6]

## A. Conditions of Confinement

Lewis alleges that from May 26, 2003, to December 12, 2004, he was housed in the infirmary under psychiatric close observation ("PCO") in rooms 196 and 197, as well as room 193, for various lengths of time, including seven separate admissions for one week; ten separate admissions for two weeks; four separate admissions for three weeks; one admission for four weeks; and eight separate admissions for three days. Lewis alleges that the rooms are extremely hot in the summer and extremely cold in the winter, the floor(s) and wall(s) are stained with blood, feces, mucus, saliva, and urine, and there are no sinks with running water or toilets in cells 196 and 197.[7] He alleges that the conditions were "directly responsible for [his] bladder becoming infected" and caused him to become sick with "cold and flu." Lewis wrote to R. Williams and Taylor regarding the conditions and submitted grievances. Lewis states that Emig, Taylor, R. Williams, and Blue were aware of the conditions as a result of his submitted grievances. (D.I. 2, ¶ IV at 1-2, exs.; D.I. 8, ¶¶ 2, 4; D.I. 18, ¶ 1; D.I. 310, ¶¶ 3-7.)

---

[5]Misspelled on the court docket as Chapel.

[6]Lewis named other defendants in the claims, but they have either been dismissed from the action or granted summary judgment. (*See* D.I. 26, 42, 101, 164, 287.)

[7]Lewis submitted a declaration, consisting of thirty-four paragraphs, that basically mirrors the allegations in the complaint. (D.I. 310.) The court will include specifics in this section as provided by Lewis in his declaration.

The record reflects that from May 2003 to March 2005, Lewis was housed in room 196 for one day in May 2003, one week in July 2003, three days in January 2004, three days in March 2004, and two days in June 2004. He was housed in room 197 on several occasions during the relevant time period for as little as one day and, on one occasion, for one month through April and May 2004. He stayed in room 193 twice in 2004, and both stays were for less than a week. (D.I. 295.)

According to Way, room 197 has a sink and a toilet, and room 196 has a Chinese toilet but no sink.[8] Inmates housed in room 196 may use a sink in the shower area during recreation time. Inmates housed in rooms 196 and 197 are required to clean them daily. If an inmate is unable to perform the task then a DOC environmental worker performs the job. According to R. Williams and Taylor, conditions at the HRYCI must meet acceptable standards of safety, security, and cleanliness.[9] (D.I. 302, A55, A118, A122.)

Lewis alleges that in August of 2003, while housed in cells 196 and 197, Blue refused to give him drinking water or let him wash his hands before meals. Lewis alleges that the repeated denial of water "amplified" his bladder infection. According to Blue, while on the 4:00 p.m. to midnight shift, he or other officers gave Lewis drinking water upon request. Blue does not recall Lewis asking officers on his shift if he could have water to wash his hands. Both R. Williams

---

[8] A toilet consisting of a drain or hole in the floor. *See LaReau v. MacDougall*, 473 F.2d 974, 977 (2d Cir. 1972).

[9] Maintenance work orders are generated through the Delaware Automated Correction System ("DACS") which has a preventive maintenance section and a regular routine work order section. Correctional staff may submit work orders for maintenance related to regulating temperature in the housing units and the infirmary. Work orders are reviewed on a daily basis, prioritized, and scheduled for maintenance. (D.I. 302, A118, A122.)

and Taylor state that they did not implement policies to prevent an inmate from receiving drinking water or washing his hands before meals while the inmate was housed in the HRYCI infirmary or while on PCO status. (D.I 2, ¶ IV at 2, exs.; D.I. 8, ¶ 3; D.I. 302, A66, A118, A122; D.I. 310, ¶ 8.)

Lewis alleges that while housed on 1-F pond, on an unspecified date, he was attacked and assaulted by another inmate who used a broomstick to shatter the window to his cell door. Lewis was taken to medical and advised to shower to remove the glass, but Wayman gave instructions not to allow Lewis to shower. Lewis waited forty-eight hours before showering the glass from his body. On February 7, 2004, C/O Julius Davis ("J. Davis") reported that inmate Earl Warren ("Warren") used a broom handle to break the window to Lewis' cell door. Lewis and his cellmate received minor scratches from glass flying into their cell and they were taken to the infirmary where they were treated. (D.I. D.I. 8, ¶ 14; D.I. 302, A102-104.)

## B. Medical Needs

Lewis alleges that several correctional officers, including Sheets, Sabato, and Berggrun, interfered with his "psychological rehabilitative treatment" by writing disciplinary infractions and sanctioning him without regard to his mental illnesses, causing him to relapse.[10] He alleges that Sheets, on November 21, 2004, Sabato, on December 12, 2004, and on other unspecified dates, Emig, Bamford, Parker, Farmer, Kennedy, Way, and Richards deliberately interfered with his prescribed psychological rehabilitative treatment by placing him in administrative segregation or the disciplinary housing unit without first obtaining a psychological assessment and conducting

---

[10]Lewis also alleges that said actions resulted in violations of his right to substantive and procedural due process. The court considers all claims, but will not repeat the allegations and evidence of record in the due process section.

disciplinary hearings while Lewis was on PCO status. He states that disciplinary hearings were held without his presence and resulted in administrative segregation, without regard for his mental health treatment, causing him significant mental anguish. Lewis wrote to Taylor, R. Williams, D. Williams, and Emig regarding the issues. Lewis claims that the supervisory defendants failed to train, supervise, act, and/or control DOC employees (D.I. 2, ¶ IV at 4; D.I. 8, ¶¶ 11, 48-50; D.I. 18, ¶¶ 13-16, 19-20, 31-37; D.I. 310, ¶¶ 29-30.)

According to Bamford, while incarcerated at the HRYCI, Lewis generated twenty-seven Class 1 disciplinary write-ups - the most serious offenses. In some instances, Lewis was placed in administrative segregation. The decision to place an inmate in administrative segregation is based on cause. An inmate who suffers from mental or psychiatric problems is not precluded from placement in administrative segregation. An inmate is medically evaluated before placement in administrative segregation, unless they are already housed in the infirmary. Lewis was placed on PCO on numerous occasions due to his mental state. (D.I. 302, A4.)

According to Emig, Sabato, Sheets, Farmer, Way, and Richards there is no Bureau of Prison ("BOP") policy that an inmate must have a psychological evaluation or assessment prior to holding an inmate disciplinary hearing. Parker is also unaware of any such policy. Mental health professionals did not inform DOC personnel that conducting disciplinary hearings with PCO inmates would be detrimental to the inmate. (D.I. 302, A1, A16, A25, A38, A40, A55, A61.)

Kennedy served a notice of disciplinary hearing upon Lewis following his involvement in a fight with another inmate. Kennedy served the documents upon Lewis because he was responsible for the area where the fight took place. According to Kennedy, there was no need for

-6-

further evaluation because the mental health staff was aware of Lewis' mental health state. Both Berggrun and Kennedy state that Lewis' mental health status did not excuse him from being sanctioned for the threatening and disrespectful behavior he exhibited while housed at the HRYCI. (D.I. 302, A47, A53, A57-58, A61-63.)

Lewis alleges that on unspecified dates, Wayman denied him adequate time with physicians when he took him to the physician's office a few minutes before count time and then abruptly ended the visit so that Lewis was unable to receive a proper consultation and/or treatment. Lewis wrote to Taylor and R. Williams regarding the issue. Wayman denies that he abruptly ended any of Lewis' doctor's visits, stating that a physician would not allow him to remove Lewis until the appointment was concluded and that he has no authority to schedule inmates for medical. (D.I. 8, ¶ 6; D.I. 18, ¶ 4; D.I. 302, A 59; D.I. 310, ¶¶ 31, 32.)

Lewis alleges that following his transfer from the Delaware Psychiatric Center ("DPC") to the DOC on June 25, 2004, he began experiencing various illnesses allegedly caused by medications he received at the DPC. Lewis further alleges that he requested an MRI and/or CT scan to determine whether he was suffering from brain damage. Lewis alleges that three physicians ignored his requests, so he wrote to Taylor, R. Williams, and Carroll, D. Williams, Emig, and Bamford regarding his medical needs issues, but they failed to act or respond, and took no action. He also submitted grievances regarding the issues. In addition, on unspecified dates, he wrote correspondence to Taylor, R. Williams, and Carroll to complain about a referral to an urologist that was denied after his transfer from the DPC to the DOC. The record reflects that on January 16, 2005, Lewis' medical grievance to see a urologist was forwarded to the Medical Department for processing. Lewis' medical records indicate that he was seen frequently

in 2004, when he was prescribed medical and mental health treatment, medication, and placed on PCO status. The records further reflect that, in early 2005, Lewis received treatment for his kidney complaints. (D.I. 18, ¶ 26; D.I. 275; D.I. 302, A65, D.I. 310, ¶ 33.)

R. Williams, Taylor, and Carroll played no role in the decision to prescribe or administer medication or medical services to Lewis. The medical service provider (i.e., First Correctional Delaware - Medical, LLC") provided all medical services to inmates. R. Williams, Taylor, and Carroll did not implement any policy that would have denied any DOC inmate necessary medical treatment. (D.I. 302, A119, A122, A126.)

R. Williams, Taylor, Carroll, and D. Williams do not recall Lewis. R. Williams received, and responded to, some of the correspondence Lewis sent directly to him. Other correspondence, with complaints or requests for assistance, would have been forwarded to appropriate personnel. For example, complaints concerning physical or mental heath problems would have been forwarded to the medical provider. (D.I. 302, A118, A121, A125.)

DOC correctional officers undergo a nine-week training course through the DOC Employee Development Center. The training includes, but is not limited to, instruction on the use of force, firearms use, use of chemical agents, CPR, first aid emergency preparedness, inmate supervision, officer safety, custody and control, medical and health issues, sexual harassment, cultural diversity, and conflict resolution. The training is designed to provide DOC correctional officers with the skills and knowledge to maintain and enhance their job performance to effectively deal with everyday stress in the work environment. Some areas require a yearly refresher course. (D.I. 302, A119, A123, A127.)

## C. Access to Courts/Taking of Legal Property

Lewis alleges that on February 11, 2005, while he was at the New Castle County Courthouse, R. Williams conducted a shakedown of the entire I-E Pod while looking for lost keys. During the search, certain grievances and grievance-related documents were removed from his cell and never returned to him. Lewis was told that R. Williams was in his unit on February 11, 2005, and that an inspection of the sign-in sheet for the relevant housing unit will demonstrate R. Williams' presence.[11] Lewis was told that certain legal documents were taken "for investigation." They were never returned.[12] R. Williams states that he was not in Lewis' housing unit on February 11, 2005, did not participate in any "shakedown" on that date, and he has never taken legal documents from Lewis' cell. Taylor states that he did not participate in the alleged removal of legal property from Lewis' cell and did not deny Lewis access to the courts. (D.I. 8, ¶ 56; D.I. 18, ¶40; D.I. 310, ¶¶ 23-24; D.I. 302, A119, A123.)

Lewis alleges that on an unspecified date while he was housed in the infirmary on PCO II status, he needed to file an application for certification to the Delaware Supreme Court, but numerous DOC personnel prevented him from sending or receiving legal mail. He alleges that he wrote to Taylor and R Williams, but they did not act or respond. *Id.* The record reflects that

---

[11]In this instance, Lewis relies upon hearsay. The "United States Supreme Court [has] rejected the view that the non-moving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *see Smith v. Kyler*, 295 F. App'x 479 (3d Cir. 2008). "[H]earsay evidence . . . may be considered if the out-of-court declarant could later present the evidence through direct testimony (i.e., in a form that would be admissible at trial." *Id.*

[12]Lewis now alleges that R. Williams took the documents in retaliation for filing this lawsuit. A retaliation claim is not before the court and the court will not consider said claim at this late date. (D.I. 310, ¶ 24.)

Lewis filed a Notice of Appeal to the Delaware Supreme Court on December 6, 2004. The letter also states that Lewis filed a response to a notice to show cause on December 14, 2004. (D.I. 2, ¶ IV at 3; D.I. 8, ¶ 5; D.I. 18; D.I. 302, A65.)

### D. Excessive Force and Failure to Protect/Intervene

Lewis alleges that during the latter part of 2003, when he was housed in Cell 1 on the detention pod, Johnson stood at the door while another correctional officer capstunned Lewis and soaked his face, head, hands, and uniform. Lewis' declaration states that on August 15, 2003, C/O Pressley ("Pressley") capstunned him until he was "soaked" after he confronted Pressley about falsifying a report, Johnson stood guard at the door, and Farmer watched the incident. Farmer escorted Lewis to the infirmary but did not allow the nurses to treat his burning skin and eyes. (D.I. 2, ¶ IV at 4; D.I. 8, ¶ 12; D.I. 310, ¶ 9-10.) A use of chemical agent report indicates that incident actually occurred on July 7, 2003, when Pressley capstunned Lewis after he displayed signs of imminent violence, disregarded orders by Pressley and Johnson to cease his conduct and continued to kick and bang on his cell doors.[13] The report indicates that the capstun was used to "prevent injury to self/others." Farmer was notified of the incident. Lewis was escorted to the infirmary, examined, and cleared by the nurse. No injuries were reported. (D.I. 312, A129, A130, A131, A134.)

Lewis alleges that while housed on 1-F Pod, on an unspecified date, Apa and Johnson used unjustifiable force when they tackled Lewis and struck him with their fist and feet. According to Lewis, Apa and Johnson physically removed him from the shower, and twisted his

---

[13]On August 15, 2003, Lewis threatened suicide and was transferred from his cell to the infirmary. (D.I. 296, D 16.) Pressley, Johnson, and Farmer are not mentioned in the August 15, 2003 incident report.

arms behind his back in a painful submission maneuver. After escorting him from the shower, Apa and Johnson tackled Lewis to the ground and kicked and punched him. Lewis states that he did not act in an aggressive or threatening manner or attempt to swing at Apa or any other corrections officer. (D.I. 8, ¶ 55; D.I. 310, ¶¶ 19-21.)

The record reflect that the incident occurred on September 23, 2003, when Lewis refused to shut his cell door as ordered and instead decided to shower even though this was not allowed because he had flooded his cell earlier that day. Apa repeatedly ordered Lewis to return to his cell, but Lewis refused and became unruly and combative. At that point, Apa attempted to guide Lewis from the shower, he placed his right hand towards Lewis' left shoulder, and twice ordered Lewis to return to his cell, but Lewis refused and slapped Apa's hand from his shoulder. Apa and Johnson grabbed Lewis by the jumper and pulled him from the shower. Lewis resisted. As Lewis was being escorted back to his cell, he made a sudden turn to his left and attempted to swing at Apa. Johnson then pulled Lewis by his chest to the floor, and Apa handcuffed Lewis. Lewis was taken to the infirmary, and the medical team found no injuries. (D.I. 302, A68-81.)

Lewis alleges that on either October 2 or 10, 2003,[14] he requested a shower before going to court, and Chudzik and Chappel responded by handcuffing and shackling him.[15] Lewis alleges he was strapped to a stretcher and "banged" into the doors and walls en route to booking and receiving. Lewis further alleges that he was thrown or dropped to the ground while he was still

---

[14]The incident report states the date of the incident was October 2, 2003. (D.I. 295, D19.)

[15]Lewis had not been allowed to take a shower because he had received a seventy-two hour recreation sanction for flooding the pod. (D.I. 2, ¶ IV at 5; D.I. 310, ¶ 12.)

handcuffed and shackled and that Chappel stepped on Lewis' hand while unnamed officers stepped on his neck and bent his legs in a painful manner. (D.I. 2, ¶ IV at 4-5, exs.; D.I. 8, ¶ 13; D.I. 310, ¶¶ 12-14.)

C/O Harriford ("Harriford") reported that on October 2, 2003, Chudzik and other DOC employees responded to a request by C/O Troy ("Troy") for assistance when Lewis refused to go to court after his request to shower was refused. Chudzik responded to the call, but does not recall the incident. Chappel and other DOC employees were asked to assist in placing Lewis in cell 158 due to his combative behavior and unstable mental state. Other than responding to the call, there is no mention of Chudzik in the report. According to the report, Lewis was handcuffed and shackled, then placed on a stretcher and taken to booking and receiving. Chappel states that Lewis was removed from the stretcher and placed on the floor of cell 158 in an attempt to prevent Lewis from hurting himself. Chappel did not see any correctional officer toss Lewis to the floor from the stretcher. He denies stepping on Lewis' hand. While Chudzik has no recall of the incident, he denies banging Lewis into doors and walls, or throwing him to the ground. (D.I. 302, A82-86, A99-100.)

Lewis alleges that on October 21, 2003, the first day of his criminal trial in the New Castle County Courthouse, Davis assaulted and threatened him in the elevator. He alleges that when they reached the ground floor, Davis threw him to the floor and ordered him not to get up. Lewis states that Davis threw him to the floor and repeatedly struck him with his fists. Lewis believes that Davis was motived by his desire to prevent Lewis from making any statements in

his own defense during trial.[16]  According to Davis, in 2003, the inside of the New Castle County Courthouse was under constant video surveillance.  Davis denies attacking Lewis in the elevator or on the ground floor of the courthouse.  Davis states that he never threatened Lewis with physical harm.  (D.I. 2, ¶ IV at 3; D.I. 8, ¶ 10;D.I. 302, A101; D.I. 310, ¶ 17.)

Lewis alleges that on an unspecified date, while he was on PCO II status, the Quick Response Team ("QRT") was supervised by Kennedy and M. Lewis who instructed the use of unjustifiable force.  The record reflects that the incident occurred on November 7, 2004, when Lewis refused a direct order to lock into his cell.  Lewis states that Kennedy and M. Lewis led the QRT, and the QRT members pushed him against the wall, tackled him to the ground, and kicked and punched him.  Lewis filed a grievance on the issue, but the investigation found no evidence to support the claim.  Kennedy denies telling anyone to use unjustifiable force on any inmate and further denies that while escorting him to the infirmary that he tackled, kicked, or punched Lewis.  (D.I. 8, ¶ 44; D.I. 302, A52-53; D.I. 3 10, ¶ 18.)

### E.  Due Process

Lewis alleges that on unspecified dates, Canon, V. Williams, Ince, and Way imposed a twenty-four hour sanction without first conducting disciplinary hearings.  Way states that there are no disciplinary hearing reports showing he imposed a twenty-four hour sanction upon Lewis without a hearing.  Lewis alleges that on unspecified dates, Sabato, Parker, Sheets, and Farmer denied his constitutional rights during disciplinary hearings including having his rights read to him, the right to an attorney, the right to be present at a disciplinary hearing, the right to call

---

[16]Lewis was represented by counsel during his criminal trial and as evidenced by documents submitted to this court, prior to the swearing in of the jury Lewis spoke at length with the presiding judge. *See Lewis v. Edinger*, Civ. No. 04-1410-GMS, D.I. 9.

witnesses, the right to confront his accuser, and the right to an appeal. (D.I. 2; D.I. 8, ¶¶ 18, 20, 21, 22, 27; D.I. 302, A54-55.)

Notices of disciplinary hearing indicate that Lewis was afforded his rights during hearings held on April 25, 2004 and December 12, 2004, by Parker and Sabato, respectively. On April 25, 2004, Parker held a disciplinary hearing for an incident that involved Lewis hitting another inmate. Lewis was present at the hearing presided over by Parker, found guilty, and received thirty days of isolated confinement. He did not appeal the finding. During the time Parker was a hearing officer at the HRYCI, he did not have the authority to place Lewis in administrative segregation.

At the hearing held before Sabato, Lewis was found guilty of sexual misconduct and disrespect and sanctioned to loss of all privileges for ninety days. Lewis did not attend the disciplinary hearing because he refused to cooperate with the proceedings and made unreasonable demands. Lewis did not appeal the sanctions. Lewis submitted two separate grievances on December 12 and 21, 2004, claiming that Sabato conducted the hearing without anyone present (except for Lewis), denied him the right to an impartial hearing officer, found him guilty, and sanctioned him to ninety days and then verbally increased the sanction to one hundred twenty days. (D.I. 2, ex.; D.l. 302, A16-23, A24 A31-36, A111-116.)

On November 7, 2004, Lewis left his cell shortly after being informed that he had a twenty-four hour loss of all privileges for a prior incident. Canon ordered Lewis to lock in, Lewis disobeyed the order, and a Code 6 was called. Correctional officers responded and Lewis was handcuffed and escorted off the pod. Lewis pled not guilty at the November 21, 2004 disciplinary hearing. During the hearing, Lewis stated that he was not served properly because of

his PCO II status. Sheets found Lewis guilty of the charges and sanctioned him to fifteen days in isolated confinement. Lewis did not appeal this decision. On November 24, 2004, Lewis submitted a grievance claiming that Sheets conducted an administrative hearing on November 21, 2004, "in total disregards [sic] to [his] mental health status" and violated his right to confront his accuser. According to Sheets, he conducted all disciplinary hearings in a fair, impartial, expedient, and professional manner, and Lewis was afforded his due process rights at the disciplinary hearings. (D.I. 2, ex.; D.I. 302, A37-39, A105-110.)

Lewis alleges that in May 2004, Farmer verbally and physically threatened him, pointed capstun at him, spoke to Bamford, and then moved him to administrative segregation without a hearing or consultation regarding his psychological treatment. Incident Report No. 3006756, dated May 3, 2004, indicates that upon Nurse Wilcox's entry into the infirmary, Lewis began calling her names. Farmer responded to the infirmary and spoke with Lewis who became belligerent and disrespectful. Farmer did not spray Lewis with capstun. Farmer advised Lewis that, if his behavior continued, he would be placed on administrative segregation, wherein Lewis responded with a vulgarity. Lewis was moved to administrative segregation and a disciplinary report was submitted. The disciplinary hearing for the offense was nullified because the next day Lewis was transferred to the DPC for evaluation and observation. (D.I. 302; D.I. 18, ¶ 23; D.I. 302, A41-42, A47-51; D.I. 310, ¶¶ 25-27.)

In his declaration, Lewis states that Sabato, Parker, Farmer, Sheets, Way, and Ince conducted disciplinary hearings resulting in administrative segregation and other sanctions without notifying him of the hearing and/or while he was on PCO status in the infirmary. Sabato, Sheets, and Farmer do not recall specific disciplinary hearings they conducted while Lewis was

on PCO status. Parker does not recall conducting many hearings involving Lewis but remembers his display of bizarre behavior. DACS indicates that, in many instances, Lewis either failed to appear at the disciplinary hearing or, when he did appear, could not remember the incident. Lewis blamed his memory loss on his prescribed medication. On numerous occasions, Lewis used his mental health status as an excuse to avoid being disciplined and for aberrant behavior. (D.I. 302, A15, A24-25, A38, A41; D.I. 310, ¶ 34.)

Taylor did not participate in grievance or disciplinary hearings. When D. Williams received a complaint from an inmate concerning a disciplinary hearing, he normally reviewed the case with the hearing officer and the parties involved, including the inmate. (D.I. 302, A123, A127.)

## III. STANDARD OF REVIEW

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). Moreover, "the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

The defendants move for summary judgment on the grounds that the claims against them in their official capacity are barred by reason of Eleventh Amendment immunity; Taylor, R. Williams, and Carroll had no personal involvement in the alleged constitutional violations; Lewis cannot maintain the conditions of confinement claim because he is no longer in state custody and because the conditions do not rise to the level of a deprivation of a single basic human need; the medical needs claim fails for lack of deliberate indifference to a serious medical need; the access to the courts claim fails because Lewis cannot show actual injury and because he had access to the courts; Lewis has an adequate state post-deprivation remedy for the taking of his legal documents; the excessive force claims fail because Lewis has not produced evidence that the defendants acted maliciously and sadistically to cause him harm; and the due process claims fail because there were no violations of a constitutionally protected right and Lewis failed to show that he was deprived of any liberty interest. (D.I. 301, 305.)

## IV. DISCUSSION

### A. Eleventh Amendment Immunity

The State defendants move for summary judgment to the extent that Lewis seeks damages against them in their official capacities. Lewis responds that the defendants are sued in their individual capacities.

The Eleventh Amendment guarantees that non-consenting states may not be sued by private individuals in federal court unless Congress abrogates the states' immunity pursuant to a valid exercise of its power. *See Board of Trustees of the Univ. of Al. v. Garrett*, 531 U.S. 356, 363 (2001). State officials acting in their official capacities have the same Eleventh Amendment immunity from damage suits as the state itself. *See Hafer v. Melo*, 502 U.S. 21, 30 (1991). Section 1983 did not abrogate the State of Delaware's Eleventh Amendment immunity and it has not waived it's immunity. *See Quern v. Jordan*, 440 U.S. 332, 340-41 (1979) (section 1983 was not intended to abrogate a State's Eleventh Amendment immunity); *Brooks-McCollum v. Delaware*, 213 F. App'x 92, 94 (3d Cir. 2007) (not published) (The State of Delaware has not waived its immunity from suit in federal court). To the extent the State defendants are sued in their official capacities, they are immune from suit. Therefore, the court will grant the State defendants' motion for summary judgment as to this issue.

### B. Personal Involvement

Taylor, R. Williams, and Carroll move for summary judgment on the grounds that they did not personally participate in the alleged constitutional violations wherein Lewis alleges that he complained to them in writing regarding a urology consultation, request for MRI and/or CT scan, or the filing of his appeal to the Delaware Supreme Court. Lewis did not respond to this

-18-

section of the defendants' summary judgment brief.

As is well established, "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

"Because vicarious liability is inapplicable to § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, __U.S.__, 129 S.Ct. 1937, 1948 (2009). In *Iqbal*, the Supreme Court emphasized that "[i]n a § 1983 suit - here masters do not answer for the torts of their servants - the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 129 S.Ct. at 1949. "Thus, when a plaintiff sues an official under § 1983 for conduct 'arising from his or her superintendent responsibilities,' the plaintiff must plausibly plead and eventually prove not only that the official's subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well." *Dodds v. Richardson*, 614 F.3d 1185, 1198 (10th Cir. 2010) (quoting *Iqbal* 129 S.Ct. at 1949.) The factors necessary to establish a § 1983 violation will vary with the constitutional provision at issue. *Id.*

There is no evidence of record showing Taylor's, R. Williams', or Carroll's personal involvement as to the claims regarding a urology consultation, request for MRI, CT scan or Lewis' appeal to the Delaware Supreme Court. Inasmuch as there are no genuine issues of fact, a

-19-

reasonable jury could not find in favor of Lewis as to these claims. For the above reasons, the

court will grant Taylor's, R. Williams', and Carroll's motion for summary judgment on the issue

of personal involvement.

### C. Conditions of Confinement

The State defendants initially moved for summary judgment on the grounds that the

conditions of confinement claims fail because Lewis is no longer in state custody. After Lewis

noted that he sought compensatory damages for the claim, the State defendants further moved for

summary judgment on the ground that none of the conditions of which Lewis complains rise to

the level of the deprivation of a single basic human need. (D.I. 311 at 6.) Lewis argues that

genuine issues of material fact remain and, therefore, summary judgment must be denied.

Because Lewis was a pretrial detainee during the relevant time period, his conditions of

confinement claims must be considered under the due process clause of the Fourteenth

Amendment as opposed to the Eighth Amendment, the applicable standard for incarcerated

persons. *Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005). The appropriate standard in a

condition of confinement claim by a pretrial detainee is "whether those conditions amount to

punishment prior to an adjudication of guilt in accordance with law." *Id.* "Not every disability

imposed during pretrial detention amounts to 'punishment' in the constitutional sense, however .

. . . [T]he fact that such detention interferes with the detainee's understandable desire to live as

comfortably as possible and with as little restraint as possible during confinement does not

convert the conditions or restrictions of detention into 'punishment.'" *Bell v. Wolfish*, 441 U.S.

520, 537 (1979). "[I]f a particular condition or restriction of pretrial detention is reasonably

related to a legitimate governmental objective, it does not, without more, amount to

punishment.'" *Bell,* 441 U.S. at 539 (citations omitted). The maintenance of security, internal order, and discipline are essential goals which at times require "limitation or retraction of . . . retained constitutional rights." *Id.* at 546. When assessing whether the conditions are reasonably related to the assigned purposes, the court must inquire whether the conditions cause an inmates to endure such genuine privations and hardship over an extended period of time such that the adverse conditions become excessive in relation to the purposes assigned to them." *Hubbard,* 399 F.3d at 159.

Lewis and Blue provide differing accounts regarding Lewis' claim that Blue denied him drinking water or water to wash his hands on numerous occasions. Accordingly, Lewis asks that summary judgment be denied on this issue. The record reflects that while housed in room 197 Lewis had a sink available to him and while housed in room 196 he had available the use of a shower during recreation time to wash his hands. The record further reflects that Blue worked the 4:00 p.m. to midnight shift. Hence, at the most Lewis was not provided water during that time. Moreover, nothing in the record reflects that Lewis was denied drinks with his meals. "As long as an inmate's meals included a beverage, the temporary denial of drinking water presents no constitutional issue. *See Tesch v. County of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (deprivation of drinking water for two days not unconstitutional when beverages were provided with meals). Even when viewing the facts in the light most favorable to Lewis, a reasonable jury could not find in his favor on this issue.

Lewis posits that summary judgment is inappropriate as to the claims against Emig, R. Williams, Taylor, and Blue, arguing that the PCO rooms where he was frequently housed from May 2003 to March 2005 subjected him to inhumane conditions, and they were aware of the

conditions as a result of grievances he had filed. Lewis' claim rests, however, on an unviable

theory. According to Lewis, it was not until he submitted grievances, that the foregoing

defendants were aware of his complaints. Participation in the after-the-fact review of a grievance

is not enough to establish personal involvement. *See, e.g., Brooks v. Beard*, 167 F. App'x 923,

925 (3d Cir. 2006) (not published) (allegations that prison officials and administrators responded

inappropriately to inmate's later-filed grievances do not establish the involvement of those

officials and administrators in the underlying deprivation). *See also Cole v. Sobina*, Civ. No. 04-

99J, 2007 WL 4460617 (W.D. Pa. Dec. 19, 2007); *Ramos v. Pennsylvania Dep't of Corr.*, Civ.

No. 06-1444, 2006 WL 2129148 (M.D. Pa. July 27, 2006); *Jefferson v. Wolfe*, Civ. No. 04-

44ERIE, 2006 WL 1947721 (W.D. Pa. July 11, 2006). *Cf. Wilson v. Horn*, 971 F.Supp. 943, 947

(E.D. Pa. 1997), *aff'd*, 142 F.3d 430 (3d Cir. 1998) (prison officials' failure to respond to

inmate's grievance does not state a constitutional claim).

In addition, Lewis does not dispute that inmates are responsible for keeping their cells

clean. The record does not reflect that Lewis was unable to perform this task. Further, the record

reflects that the various confinements were of such short duration, they are not sufficient to

support a finding that he was deprived of life's necessities for an unreasonable period of time.

Indeed, Room 197, where Lewis was housed most frequently and for the only one month period

of time, contains both a sink and a toilet. Finally, it seems from the record that the restrictions in

rooms and 196 and 197 were related to Lewis' confinement under close medical and psychiatric

watch, and consequently, appear to be based on medical, safety, and security concerns rather than

for the purpose to punish Lewis.

Based upon the record, the court concludes that a reasonable jury could not find the

conditions Lewis experienced amounted to the type of genuine privation that qualifies as punishment. For the above reasons, the court will grant the State defendants' motion for summary judgment on the conditions of confinement issues.

### D. Medical Needs

The State defendants move for summary judgment on the grounds that Lewis failed to establish that they intentionally denied or delayed his access to medical care, had a policy or custom that caused a violation of his constitutional rights, and Lewis simply disagreed with the treatment provided. Lewis opposes this portion of the motion on the grounds that material facts remain in dispute and, therefore, summary judgment must be denied.

As previously discussed, a claim by a pretrial detainee challenging the conditions of confinement in a state detention facility is analyzed under the Due Process Clause of the Fourteenth Amendment. *See Hubbard v. Taylor*, 399 F.3d at 157-58. Courts have concluded that the Fourteenth Amendment affords pretrial detainees protections that are "at least as great as the Eighth Amendment protections afforded to a convicted prisoner." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)). Hence, when assessing medical claims by pretrial detainees, courts may apply the deliberate indifference standard established under the Eighth Amendment but must view the inquiry in the context of the *Bell v. Wolfish* standard, which applies Fourteenth Amendment due process principles and not the cruel and unusual punishment standard to pretrial detainees. *See Hubbard v. Taylor,* 399 F.3d 150, 165-66 (3d Cir. 2005). The deliberate indifference standard requires a finding of a serious medical need and acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale,* 318 F.3d at 582. A

prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

The State defendants, relying upon medical records produced by the medical defendants, argue that the records do not show any DOC employee interfered with Lewis' medical care and treatment.[17] (*See* D.I. 275.) In his opposition, Lewis specifically refers to the following incidents: (1) in May 2004, while he was on PCO status and housed in the infirmary, Farmer, Sheets, Sabato, and Bamford transferred him to administrative segregation without a hearing or consultation regarding Lewis' psychological treatment; (2) on dates not provided, Parker, Kennedy, Richards, and Way, interfered with his psychological rehabilitative treatment when they conducted disciplinary hearings and sanctioned him to administrative segregation while Lewis was on observation status in the infirmary; (3) on dates not provided, Wayman denied Lewis adequate time for medical treatment, particularly when he was treated by Dr. Arumburo; and (5) Lewis submitted grievances and wrote to Taylor, R. Williams, Carroll, D. Williams, Emig, and Bamford regarding his medical issues, but no action was taken and the foregoing defendants failed to act or respond.

Lewis' position is that the State defendants took disciplinary action against him without

---

[17]The State defendants did not cite to a docket item or provide the medical records as an exhibit to their motion having incorrectly assumed that they were provided to the court by the medical defendants on June 4, 2010. (*See* D.I. 242.) Nor did they reference the court to specific pages of the medical records. Following a review of the extensive court docket consisting of 313 entries, it was discovered that Lewis, and not the medical defendants, filed the documents on June 15, 2010, as a CD exhibit in support of his motion to compel (D.I. 260) filed the same day. The voluminous records - over eleven hundred pages - contain medical records for years (i.e., 2006, 2007, 2008, 2009) irrelevant to the relevant time frame and, because the court was not provided with cites, the court was required to review the entire medical record. Counsel is admonished to provide specific cites and/or provide only documents relevant to the issues raised in future filings with the court.

considering his mental health condition and psychological treatment and, in turn, this interfered with his treatment. The only evidence Lewis presents in support of this claim is his conclusory declaration which is basically a reiteration of the allegations in his complaint. Lewis' voluminous medical records indicate that he received medical and mental health treatment. Lewis did not refute the evidence submitted by the State defendants that mental health care workers did not advise the State defendants that conducting disciplinary hearings for inmates on PCO would be detrimental to the inmate. Hence, the record does not support a finding that the State defendants knew or must have known that subjecting Lewis to disciplinary action was detrimental to his mental health or that it deprived him of mental health treatment.

The court finds specious the claim that Wayman denied Lewis "adequate time" for medical treatment. Lewis concedes he was treated by Dr. Arumburo, but complains his visits were not long enough. Wayman did not deny Wayman medical treatment. Rather, he escorted Lewis to medical to receive treatment.

Finally, Lewis cannot prevail on his claim that Taylor, R. Williams, Carroll, D. Williams, Emig, and Bamford failed to act or respond to his medical complaints. The U.S. Court of Appeals for the Third Circuit has concluded that prison administrators cannot be deliberately indifferent "simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor." *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993). The Third Circuit clarified that "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) (discussing *Durmer*, 991 F.2d at 69). "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their

-25-

assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id.* at 236. Nothing in the record leads to the conclusion that the foregoing defendants had reason to believe that Lewis was not receiving the care he required.

Upon review of the record, the court finds that there is insufficient evidence to enable a jury to reasonably find for Lewis on the medical needs issue. Therefore, the court will grant the motion for summary judgment as to this issue.

### E. Access to Courts/Taking of Legal Property

Taylor and Warden move for summary judgment on the grounds that the record does not establish that Lewis was actually injured by his alleged denial of access to the courts. Lewis did not respond to this portion of the motion for summary judgment. Taylor and Warden also move for summary judgment on the basis that the taking of his legal property claim is not actionable under § 1983. Lewis responds that the legal documents were taken by R. Williams in retaliation for Lewis' filing this lawsuit.

Prisoners must be allowed "adequate, effective and meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977) (holding that prisons must give inmates access to law libraries or direct legal assistance). "Many courts have found a cause of action for violation of the right of access stated where it was alleged that prison officials confiscated and/or destroyed legal materials." *Zilich v. Lucht*, 981 F.2d 694, 695 (3d Cir. 1992) (citations omitted). However, a violation of the First Amendment right of access to the courts is only established where a litigant shows that he was actually injured by the alleged denial of access. The actual injury requirement is a constitutional prerequisite to suit. *Lewis v. Casey*, 518 U.S. 343, 351 (1996);

*Christopher v. Harbury*, 536 U .S. 403, 415 (2002) (explaining that the constitutional right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court"). An actual injury is shown only where a nonfrivolous, arguable claim is lost. *Christopher,* 536 U.S. at 415.

The record does not reflect a violation of Lewis' right to access the courts or, actual injury, as a result of any alleged denial. Lewis does not deny that he was allowed to file his appeal with the Delaware Supreme Court. It is evident from his numerous filings, in this, and other cases he filed in this court, that he has been able to prosecute his civil lawsuits.[18]

Finally, Lewis impermissibly attempts to expand upon the original allegations with a retaliation claim, through argument in his brief. *See Dewees v. Haste*, 620 F. Supp. 2d 625, 635 (M.D. Pa. 2009). Federal pleading standards do not allow a party "to raise new claims at the summary judgment stage . . . . Liberal pleading does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of the facts set forth in the complaint." *Id.* at n.7 (citing *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11th Cir. 2004); *see also Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"); *Speziale v. Bethlehem Area Sch. Dist.*, 266 F. Supp. 2d 366, 371 n.3 (E.D. Pa. 2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the [summary judgment] responsive papers")).

---

[18]With regard to his missing legal documents, Delaware law provides an adequate remedy for Lewis, and therefore, he cannot maintain a cause of action for loss of said property pursuant to § 1983. *See Hudson v. Palmer,* 468 U.S. 517, 535 (1984); *See Parratt v. Taylor,* 451 U.S. 527, 542 (1981); *Nicholson v. Carroll*, 390 F. Supp. 2d 429, 435 (D. Del. 2005); *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157 (D. Del. 2001).

The record does not support a finding that Lewis was denied access to the courts. Therefore, the court will grant the State defendants' motion for summary judgment on this issue.

## F. Excessive Force

State defendants move for summary judgment on the grounds that there is no evidence that the State defendants acted maliciously and sadistically to cause harm to Lewis. They argue that their actions were in response to Lewis' refusal to obey orders, his disorderly conduct, and threatening behavior. Lewis opposes the motion and argues that it should be denied as material facts remain in dispute with respect to several excessive force incidents.

The State defendants point to Lewis' failure to obey direct orders to lock into his cell on September 23, 2003 (when he lunged at one of the State defendants in an effort to punch him) and on November 7, 2004, and his refusal to go to court on October 2, 2003. In his opposition, Lewis refers to the August 15, 2003 (actually July 7, 2003) failure to protect claim against Johnson when Lewis was capstunned by Pressley. He states that he obeyed all orders and the use of capstun was unprovoked, while the incident report indicates that Lewis refused several direct orders to cease his disorderly conduct.[19] Lewis refers to the September 23, 2003, excessive force claims against Apa and Johnson and states that he did not act in an aggressive or threatening manner, but does not deny that he refused a direct order to return to his cell. With regard to the October 2, 2003 excessive force and failure to protect claims against Chudzik and Chapel, Lewis states that he complied with order to go to the back of his cell and lie down, while the State defendants indicate the actions were taken in an attempt to prevent Lewis from hurting himself.[20]

---

[19]Lewis incorrectly states that no incident report was written regarding this occurrence.

[20]Once again, Lewis incorrectly states that there is no incident report for this occurrence.

As to the October 21, 2003, excessive force claim against Davis, Lewis claims that Davis threw him to the floor and struck him with his fists, while Davis denies attacking Lewis. Finally, with respect to the November 7, 2004 excessive force and failure to protect claims against Kennedy and M. Lewis, Lewis omits the fact that the QRT was called as a result of Lewis' failure to obey a direct order to lock into his cell.

The incidents of which Lewis complain occurred while he was a pretrial detainee. Excessive force claims for pretrial detainees are analyzed under the Fourteenth Amendment. *Fuentes v. Wagner*, 206 F.3d 335 (3d Cir. 2000); *see also Sylvester v. City of Newark*, 120 F. App'x 419, 423 (3d Cir. 2005) (not published). *Fuentes* instructs that "when a court is called upon to examine the amount of force used on a pretrial detainee for the purpose of institutional security, the appropriate analysis is . . . whether the measure taken inflicted unnecessary and wanton pain and suffering depends on "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm." *Fuentes*, 206 F.3d at 347. Accordingly, the Eighth Amendment cruel and unusual punishments standards found in *Whitley v. Albers*, 475 U.S. 312 (1986) and *Hudson v. McMillian*, 503 U.S. 1 (1992), apply to a pretrial detainee's excessive force claim arising in the context of a prison disturbance.[21] *Id.* Therefore, for a pretrial detainee to state an excessive force claim against a prison official, he must adduce evidence that the force used was applied "maliciously and sadistically to cause harm" and not "in a good-faith effort to maintain or restore discipline." *Hudson v. McMillian*, 503 U.S. at 6.

---

[21]A prison disturbance may be a riot or a lesser disruption; for example "whenever guards use force to keep order." *See Hudson*, 503 U.S. at 6-7.

Prison officials are accorded substantial latitude where prison security and the safety of prisoners and officers is at stake. The infliction of pain in the course of a prison security measure does not amount to a constitutional violation simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense. *Whitley*, 475 U.S. at 219. Viewing the record in light of these factors, the court finds that Lewis cannot prevail on his excessive force claims. In each instance (with the exception of the October 21, 2003 incident), the defendants took action after Lewis disobeyed or disregarded orders, refused to go to court, or acted aggressively towards correctional staff.

With respect to the October 21, 2003 incident, the parties provide differing accounts. Lewis alleges he was assaulted by Davis and now declares that Davis threw him to the floor and struck him repeatedly, while Davis states that no such thing happened, and could not have happened, given the twenty-four surveillance cameras in the courthouse. The court has scoured the record and it does not contain an incident report, grievance, or any medical records that refer to the October 21, 2003 incident. Nor does Lewis state that he was injured or sought medical treatment as a result of the alleged actions of Davis.

Although it is not required that Lewis show he suffered more than a *de minimis* injury to maintain his excessive force claim, *see Wilkins v. Gaddy*, ___U.S.___, 130 S.Ct. 1175, 1179-1180 (2010) (noting that the notion that significant injury is a threshold requirement for stating an excessive force claim was rejected in *Hudson v. McMillian*, 503 U.S. at 7), the "absence of [a] serious injury" nevertheless remains relevant in an Eighth Amendment inquiry. *Wilkins*, 130 S.Ct. at 1179-1180 (holding that the extent of injury may provide some indication of the amount

of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim") (citing *Hudson*, 503 U.S. at 9 (internal quotations omitted). Here, Lewis has failed to produce any evidence showing a discernible injury. Based upon the record, a reasonable jury could not find in Lewis' favor as to the October 21, 2003 incident.

The court further notes that, as to the other incidents, Lewis does not allege any other discernable injuries, and the record does not indicate that he sustained any injuries. With respect to July 7, 2003 and September 23, 2003, there is specific mention that Lewis was taken to medical, but there were no injuries. In the capstun incident, the injuries of which he complains are nothing more than the normal after effects associated with the use of mace. His other complaints of painful maneuvers by correctional officers, similarly, are not out of the ordinary in the context of controlling an inmate.

In addition, the evidence indicates that, throughout the relevant time period, Lewis was disruptive, disorderly, threatening and a danger to himself and others. Even construing the facts in the light most favorable to Lewis, as the court must, the State defendants' actions must be afforded substantial latitude given Lewis' medical condition relative to his safety and that of the correctional officers. Accordingly, the court finds that "the need for the application of force" was on account of "the extent of the threat to the safety of staff and inmates" that Lewis' conduct posed and done in a good faith effort to maintain or restore discipline. *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (citation omitted). A reasonable jury could not find that, based on the circumstances, the force used in each instance was excessive. Accordingly, the court will grant the State defendants's motion for summary judgment on the issue of excessive force.

## G. Due Process

The State defendants argue that, because Lewis' allegations fall short of violating any constitutionally protected right and he failed to show that he was deprived of any liberty interest, summary judgment should be granted on the Fourteenth Amendment due process claim. Lewis responds that Sabato, Parker, Farmer, Sheets, Way, and Ince violated his substantive and procedural due process rights when they conducted disciplinary hearings that resulted in administrative segregation and other sanctions without notifying Lewis of the hearing and/or while he was on PCO status in the infirmary. Lewis contends that the court should engage in a fact specific inquiry that includes his psychological condition to determine whether there exits protected liberty interests. Lewis also contends that he was deprived of advance notice and the opportunity to defend against the charges.

Unlike sentenced inmates, pretrial detainees have a liberty interest in being free from punishment prior to conviction under the Due Process Clause.[22] *Bell v. Wolfish,* 441 U.S. 520, 535-36 (1979). "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." *Id.* at 538. Therefore, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees." *Id.* at 539.

---

[22]Lewis and the State defendants mistakenly rely upon *Sandin v. Conner*, 515 U.S. 472 (1995) to support their positions. *Sandin* applies only to convicted inmates, not pretrial detainees. *Stevenson v. Carroll*, 495 F.3d 62, 69 n.4 (3d Cir. 2007).

In the absence of substantial evidence in the record to indicate that the officials have exaggerated their response, courts should ordinarily defer to the expert judgment of corrections officials in determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, given that said considerations are peculiarly within the province and professional expertise of corrections officials. *Id.* at 540 n.23.

Unconstitutional punishment typically includes both objective and subjective components. *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). The objective component requires an inquiry into whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" *Id.* (citations omitted).

With respect to the procedural due process claims, the procedures required by *Wolff v. McDonnell*, 418 U.S. (1974), apply if the restraint on liberty is imposed for disciplinary reasons; if the restraint is for 'administrative' purposes, the minimal procedures outlined in *Hewitt v. Helms*, 459 U.S. 460 (1983) are all that is required. *Stevenson*, 495 F.3d at 70. In *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974), the Supreme Court held that prisoners must be accorded due process before prison authorities may deprive them of state created liberty interests. A prison disciplinary hearing satisfies the Due Process Clause if the inmate is provided with: (1) written notice of the charges and not less than 24 hours to marshal the facts and prepare a defense for an appearance at the disciplinary hearing; (2) a written statement by the fact finder as to the evidence relied on and the reasons for the disciplinary action; and (3) an opportunity "to call witnesses and present documentary evidence in his defense when to do so will not be unduly

hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 563-71. Under *Hewitt v. Helms*, pretrial detainees who are transferred into more restrictive housing for administrative purposes must be provided an explanation of the reason for their transfer as well as an opportunity to respond. *Stevenson*, 495 F.3d at 70 (citations omitted).

After reviewing the record, the court concludes that Lewis has not satisfied the objective component of his substantive due process claim. In virtually every instance, Lewis was disciplined as a result of his conduct. For example, he was charged with hitting another inmate, sexual misconduct, disrespect, and the failure to obey orders. It is evident that the restrictions imposed upon him were reasonably related to the legitimate goal of maintaining security and order in the prison. Moreover, there is no evidence of record to evidence a purposeful intent on the part of prison officials to punish Lewis.

In addition, the record reflects that Lewis was provided his required procedural due process rights even though, at times, he did not wish to be a part of the process. The record reflects that Lewis was subjected to administrative segregation on one occasion after being warned of the transfer if his disruptive behavior did not stop. Upon his transfer, a disciplinary report was submitted, but the offense was nullified because Lewis was transferred the next day to the DPC.

Finally, Lewis as a pretrial detainee with mental health issues, was not entitled to greater protection than that provided under the Fourteenth Amendment. *See e.g., Cloutheir v. County of Contra Costa*, 591 F.3d 1232 (9th Cir. 2010) (refusing to apply a professional judgment standard used for the civilly committed in a medical needs pretrial detainee case.) As discussed above, the State defendants were unaware of any policy that required Lewis undergo a psychological

evaluation or assessment prior to holding his disciplinary hearings. Nor were the State officials ever advised that Lewis would be harmed in conducting said hearings. Based upon the record, a reasonable jury could not find violations of Lewis' right to due process. Therefore, the court will grant the State defendants' motion for summary judgment on the due process issues.

## V. CONCLUSION

For the above reasons, the court will grant the grant the State defendants' motion for summary judgment.

An appropriate order will be issued.

CHIEF, UNITED STATES DISTRICT JUDGE

_____June 10_____, 2011
Wilmington, Delaware